UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

JACKIE E. THOMPSON        :
        :
     v.        :     C.A. No. 06-232S
        :
JO ANNE B. BARNHART        :
Commissioner of Social Security        :

**REPORT AND RECOMMENDATION**

Lincoln D. Almond, United States Magistrate Judge

This matter is before the Court for judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying Social Security Disability Income ("SSDI") benefits under the Social Security Act ("Act"), 42 U.S.C. § 405(g).  Plaintiff filed his Complaint on May 19, 2006 seeking to reverse the decision of the Commissioner.  On October 13, 2006, Plaintiff filed a Motion to Reverse Decision of the Commissioner.  (Document No. 7).  On November 7, 2006, the Commissioner filed a Motion for an Order Affirming the Decision of the Commissioner.  (Document No. 8).  Plaintiff replied on November 30, 2006.  (Document No. 9).

This matter has been referred to me for preliminary review, findings and recommended disposition.  28 U.S.C. § 636(b)(1)(B); LR Cv 72.  Based upon my review of the record and the legal memoranda filed by the parties, I find that there is substantial evidence in this record to support the Commissioner's decision and findings that the Plaintiff is not disabled within the meaning of the Act.  Consequently, I recommend that the Commissioner's Motion for an Order Affirming the Decision of the Commissioner (Document No. 8) be GRANTED and that the Plaintiff's Motion to Reverse Decision of the Commissioner (Document No. 7) be DENIED.

**I.      PROCEDURAL HISTORY**

Plaintiff filed an application for SSDI on November 21, 2003, alleging disability as of December 31, 1997.  (Tr. 81-83).  The application was denied initially (Tr. 55-59) and on reconsideration. (Tr. 61-63).  On October 4, 2005, Administrative Law Judge Barry H. Best ("ALJ") held a hearing at which Plaintiff, represented by counsel, and a vocational expert ("VE"), testified. (Tr. 25-54).  The ALJ issued a decision on October 27, 2005 finding that Plaintiff was not disabled and not entitled to SSDI.  (Tr. 14-23).  The Appeals Council denied Plaintiff's request for review on March 24, 2006.  (Tr. 6-9).  A timely appeal was then filed with this Court.

## II.     THE PARTIES' POSITIONS

Plaintiff argues that the ALJ failed to (1) properly evaluate obesity pursuant to Social Security Ruling 02-01p; (2) properly evaluate the opinions of examining physicians; and (3) appropriately apply the Treating Physician Rule, 20 C.F.R. § 404.1527(d)(2).  Further, Plaintiff argues that substantial evidence does not support the ALJ's decision.

The Commissioner disputes Plaintiff's claims and argues that there is substantial evidence in the record to support her decision that Plaintiff failed to meet his burden of establishing disability within the meaning of the Act.

## III.     THE STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  Ortiz v. Sec'y of Health and Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v. Sec'y of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).

Where the Commissioner's decision is supported by substantial evidence, the court must affirm, even if the court would have reached a contrary result as finder of fact. <u>Rodriguez Pagan v. Sec'y of Health and Human Servs.</u>, 819 F.2d 1, 3 (1st Cir. 1987); <u>Barnes v. Sullivan</u>, 932 F.2d 1356, 1358 (11th Cir. 1991). The court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. <u>Frustaglia v. Sec'y of Health and Human Servs.</u>, 829 F.2d 192, 195 (1st Cir. 1987); <u>Parker v. Bowen</u>, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

The court must reverse the ALJ's decision on plenary review, however, if the ALJ applies incorrect law, or if the ALJ fails to provide the court with sufficient reasoning to determine that he or she properly applied the law. <u>Nguyen v. Chater</u>, 172 F.3d  31, 35 (1st Cir. 1999) (*per curiam*); <u>accord</u> <u>Cornelius v. Sullivan</u>, 936 F.2d 1143, 1145 (11th Cir. 1991). Remand is unnecessary where all of the essential evidence was before the Appeals Council when it denied review, and the evidence establishes without any doubt that the claimant was disabled. <u>Seavey v. Barnhart</u>, 276 F.3d 1, 11 (1st Cir. 2001) <u>citing</u>, <u>Mowery v. Heckler</u>, 771 F.2d 966, 973 (6th Cir. 1985).

The court may remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. <u>Seavey</u>, 276 F.3d at 8. To remand under sentence four, the court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. <u>Id.</u>; <u>accord</u> <u>Brenem v. Harris</u>, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow her to explain the basis for her decision. Freeman v. Barnhart, 274 F.3d 606, 609-610 (1st Cir. 2001). On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council). After a sentence four remand, the court enters a final and appealable judgment immediately, and thus loses jurisdiction. Freeman, 274 F.3d at 610.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

> The court...may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g). To remand under sentence six, the claimant must establish: (1) that there is new, non-cumulative evidence; (2) that the evidence is material, relevant and probative so that there is a reasonable possibility that it would change the administrative result; and (3) there is good cause for failure to submit the evidence at the administrative level. See Jackson v. Chater, 99 F.3d 1086, 1090-1092 (11th Cir. 1996).

A sentence six remand may be warranted, even in the absence of an error by the Commissioner, if new, material evidence becomes available to the claimant. Id. With a sentence six remand, the parties must return to the court after remand to file modified findings of fact. Id. The court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings. Id.

## IV.    THE LAW

-4-

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do her previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

## A.    Treating Physicians

Substantial weight should be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise.  See Rohrberg v. Apfel, 26 F. Supp. 2d 303, 311 (D. Mass. 1998); 20 C.F.R. § 404.1527(d).  If a treating physician's opinion on the nature and severity of a claimant's impairments, is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(d)(2).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  See Keating v. Sec'y of Health and Human Servs., 848 F.2d 271, 275-276 (1st Cir. 1988).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).  When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the medical evidence

supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical conditions at issue; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R § 404.1527(d). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. See 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(e). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (see 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because that ultimate determination is the province of the Commissioner. 20 C.F.R. § 404.1527(e). See also Dudley v. Sec'y of Health and Human Servs., 816 F.2d 792, 794 (1st Cir. 1987).

### B.    Developing the Record

The ALJ has a duty to fully and fairly develop the record.   Heggarty v. Sullivan, 947 F.2d 990, 997 (1st Cir. 1991). The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right if counsel is not retained. See 42 U.S.C. § 406; Evangelista v. Sec'y of Health and Human Servs., 826 F.2d 136, 142 (1st Cir. 1987). The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel. Id. However, where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty. See Heggarty,

947 F.2d at 997, citing Currier v. Sec'y of Health Educ. and Welfare, 612 F.2d 594, 598 (1st Cir. 1980).

### C.    Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 416.917; see also Conley v. Bowen, 781 F.2d 143, 146 (8th Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision.  Carrillo Marin v. Sec'y of Health and Human Servs., 758 F.2d 14, 17 (1st Cir. 1985).

### D.    The Five-step Evaluation

The ALJ must follow five steps in evaluating a claim of disability.  See 20 C.F.R. §§ 404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, she is not disabled.  20 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.  20 C.F.R. § 404.1520(e).  Fifth, if a claimant's impairments (considering her residual functional capacity, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.  20 C.F.R. § 404.1520(f).  Significantly, the claimant bears the burden of proof at steps one through

four, but the Commissioner bears the burden at step five. <u>Wells v. Barnhart</u>, 267 F. Supp. 2d 138, 144 (D. Mass. 2003) (five-step process applies to both SSDI and SSI claims).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. <u>Davis v. Shalala</u>, 985 F.2d 528, 534 (11th Cir. 1993).

The claimant bears the ultimate burden of proving the existence of a disability as defined by the Social Security Act. <u>Seavey</u>, 276 F.3d at 5. The claimant must prove disability on or before the last day of her insured status for the purposes of disability benefits. <u>Deblois v. Sec'y of Health and Human Servs.</u>, 686 F.2d 76 (1st Cir. 1982), 42 U.S.C. §§ 416(i)(3), 423(a), (c). If a claimant becomes disabled after she has lost insured status, her claim for disability benefits must be denied despite her disability. <u>Id.</u>

### E.     Other Work

Once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy. <u>Seavey</u>, 276 F.3d at 5. In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant. <u>Allen v. Sullivan</u>, 880 F.2d 1200, 1201 (11th Cir. 1989). This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines (the "grids"). <u>Seavey</u>, 276 F.3d at 5. Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from

an exertional impairment, without significant non-exertional factors.  Id.; see also Heckler v. Campbell, 461 U.S. 458, 103 S. Ct. 1952, 76 L.Ed.2d 66 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).

Exclusive reliance is not appropriate when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills.  Nguyen, 172 F.3d at 36.  In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert.  Heggarty, 947 F.2d at 996.  It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy.  See Ferguson v. Schweiker, 641 F.2d 243, 248 (5th Cir. 1981).  In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations.

### 1. Pain

"Pain can constitute a significant non-exertional impairment."  Nguyen, 172 F.3d at 36. Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged.  42 U.S.C. § 423(d)(5)(A).  The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. § 404.1528.  In determining whether the

medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the First Circuit's six-part pain analysis and consider the following factors:

> (1)     The nature, location, onset, duration, frequency, radiation, and intensity of any pain;
>
> (2)     Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);
>
> (3)     Type, dosage, effectiveness, and adverse side-effects of any pain medication;
>
> (4)     Treatment, other than medication, for relief of pain;
>
> (5)     Functional restrictions; and
>
> (6)     The claimant's daily activities.

Avery v. Sec'y of Health and Human Servs., 797 F.2d 19, 29 (1st Cir. 1986).  An individual's statement as to pain is not, by itself, conclusive of disability.  42 U.S.C. § 423(d)(5)(A).

### 2.     Credibility

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  Rohrberg, 26 F. Supp. 2d at 309.  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  See Frustaglia, 829 F.2d at 195.  The failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true.  See DaRosa v. Sec'y of Health and Human Servs., 803 F.2d 24 (1st Cir. 1986).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.  See Smallwood v. Schweiker, 681 F.2d 1349, 1352

(11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995) (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983)).

## V.    APPLICATION AND ANALYSIS

Plaintiff was forty years old when the ALJ issued his decision.  (Tr. 31, 81).  Plaintiff has an eleventh-grade education and subsequently obtained a general equivalency diploma ("GED") in 1983.  (Tr. 31, 102).  Plaintiff's past work had been as a soldier, an assembler, a UPS handler, a heating and air conditioning technician and a transport technician.  (Tr. 32-34, 97).

In July 1990, while in the army, Plaintiff injured his left knee while running up a hill.  (Tr. 269).  He reinjured it in February 1991 playing basketball, and underwent knee surgery in September 1991.  (Tr. 269-270).  Six months after surgery, Plaintiff still had quadriceps girth deficiency, but his anterior drawer test was normal, there was full range of flexion in the knee and his gait was near normal without pain or limp.  (Tr. 273).

In December 1995, an MRI showed that the medial meniscus was almost completely absent and that there was some mild degenerative change in the medial compartment.  (Tr. 113).  On December 28, 1995, Plaintiff underwent arthroscopy of the left knee, debridement of a tear stretch injury to the anterior cruciate ligament ("ACL") and reparative cartilage surgery ("chondroplasty") of the rounded projection of the bottom of the femur ("medial femoral condyle") of the left knee.  (Tr. 112).

In March 1997, Plaintiff went to Warwick Medical Walk-In with complaints of sharp, constant pain in his left knee that radiated down his calf after having re-injured the knee the previous

evening.  (Tr. 274).  Plaintiff alleges that he became disabled on December 31, 1997 and has been unable to work since that time.  (Tr. 81).

In September 1999, Plaintiff was seen at Warwick Medical Walk-In for an injury to his left knee after having fallen off of a ladder.  (Tr. 275).  Range of motion in the knee was painful but full, and a sprained left knee was diagnosed.  Id.  X-rays of Plaintiff's left knee showed minimal joint effusion, some loose bodies in the anterior aspect of the joint space and degenerative arthritis, mostly involving the medial compartment and mildly involving the patellofemoral compartment.  (Tr. 309).

On December 12, 2001, Plaintiff was seen at Warwick Medical Walk-In for complaints of severe left knee pain.  (Tr. 127).  On December 18, 2001, Plaintiff was seen by Dr. Paul Fadale, of University Orthopedics, for a complaint of worsening pain and instability in the left knee.  (Tr. 310-311).  There was no general ligament laxity and range of motion was symmetrical.  (Tr. 310). Plaintiff was diagnosed with (1) medial compartment degenerative joint disease with varus angulation; (2) ACL insufficiency; and (3) status post meniscus resection of unknown quantity.  (Tr. 311).  Plaintiff was referred to Dr. Richard Limbird for consideration of high tibial osteotomy and released to moderate duty as tolerated.  (Tr. 311).

When Dr. Limbird examined Plaintiff on January 11, 2002, he observed that Plaintiff was in no acute distress and walked with a normal gait and no antalgia.  (Tr. 129).  Plaintiff's left knee demonstrated palpable osteophyte along the medial compartment.  Id.  The left knee was slightly varus but it was stable medially and laterally.  Id.  Dr. Limbird diagnosed unicompartmental arthritis of Plaintiff's left knee and noted that, despite a deficiency of the ACL, the absence of meniscal tissue, Plaintiff did not demonstrate any significant instability of his left knee.  (Tr. 130).

In September 2002, Plaintiff was again seen at Warwick Medical Walk-In for complaints of left knee pain. (Tr. 126). An MRI showed that the ACL reconstruction graft appeared to be intact but there was a slight anterior translation of the tibia; severe osteoarthritis of the knee joint with at least one loose body anteriorly; and a complex tear of the medial meniscus or a prior meniscectomy. (Tr. 124-125). The patellofemoral cartilage appeared preserved and the collateral ligaments were intact. (Tr. 124).

On November 6, 2002, Plaintiff was seen at Warwick Medical Walk-In for a complaint of sharp, constant pain in his right shoulder. (Tr. 123). Tendonitis of the right shoulder was diagnosed. Id.

Plaintiff began outpatient psychotherapy with a licensed clinical social worker, Ms. Linda DiConti, in October 2002. (Tr. 182-187). Plaintiff reported various mild to moderate symptoms. (Tr. 183). On November 14, 2002, Dr. Joseph Rodgers conducted a psychiatric evaluation of Plaintiff and diagnosed a dysthymic disorder and rated Plaintiff's global assessment of functioning ("GAF") at 55[1]. (Tr. 190-195). Plaintiff reported he was the "primary caretaker" for his son and was a self-employed "handyman" out looking for other work. (Tr. 190). Plaintiff continued to see Ms. DiConti over the next several years, and throughout that period she consistently rated his GAF at 60. (Tr. 133-167, 314-321, 323-331).

Plaintiff last met the disability insured status requirement for SSDI on September 30, 2003, and thus had to establish disability on or prior to that date. (Tr. 17, 22 at Finding 1, 94). In October

---

[1] A GAF rating of between 51 and 60 is indicative of an individual who has moderate psychological symptoms or moderate difficulty in social, occupational or school functioning. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994). The higher the rating within a given range, the less severe is the difficulty.

2003, Plaintiff indicated that he had not received medical treatment for his physical impairments since at least 2002. (Tr. 98-100, 103).

In January 2004, Dr. Kenneth Morrissey conducted a consultative examination of Plaintiff. (Tr. 209-210). Plaintiff complained only of left knee problems. (Tr. 209). He complained of ongoing pain across his left knee, he had a mild tibial varus deformity and he wore a left knee brace and used a cane in his right hand to get around. Id. There was some crepitus of the patellofemoral joint and the medial compartment of Plaintiff's left knee. Id. Quadriceps strength was 4+ on the left and 5+ on the right. Use of a cane in Plaintiff's right hand significantly improved his otherwise antalgic gait pattern. Id. X-rays of Plaintiff's left knee showed "early" degenerative changes, spurring across the knee and some "mild" joint narrowing across the medial side of the knee. (Tr. 210). Dr. Morrissey opined that a cane and brace was medically necessary for anything but the shortest of walks, that Plaintiff could not squat or kneel and that walking down stairs or for any distance was difficult. Id.

In January 2004, Dr. Susan Diaz Killenberg reviewed the medical records with respect to Plaintiff's treatment for his dysthymia and prepared a psychiatric review technique form ("PRTF") wherein she rated the functional limitations that the dysthymia caused. (Tr. 55, 211-221). She opined that the dysthymia improved with treatment and that it resulted in no restrictions of daily living activities; no difficulty maintaining social functioning; only mild difficulty maintaining concentration, persistence and pace and that it had not resulted in any episodes of extended decompensation. (Tr. 214, 221).

In March 2004, Dr. Alberto Tonelli reviewed Plaintiff's medical records and prepared an assessment of Plaintiff's physical residual functional capacity. (Tr. 227-235). Dr. Tonelli concluded

that Plaintiff could lift and carry ten pounds frequently and twenty pounds occasionally, could sit for about six hours in an eight-hour workday, and that he could stand for at least two hours in an eight-hour workday but needed to use a hand-held assistive device while walking.  (Tr. 228-229). In making this determination, Dr. Tonelli noted Plaintiff's height and weight and took into consideration the clinical findings with respect to his knee problems.  (Tr. 229).  Dr. Tonelli also opined that Plaintiff could climb, balance, stoop, kneel, crouch or crawl only occasionally.  (Tr. 230).

On October 19, 2004, more than a year after Plaintiff's disability insured status had expired and after an absence of more than two years, Plaintiff returned to Dr. Limbird with a complaint of lower back pain radiating down his left leg.  (Tr. 128).  On examination, Dr. Limbird noted that Plaintiff had reasonable motion in both hips and full extension and 130 degrees of flexion in his knee.  Id.  Plaintiff had medial joint line pain in his knee and varus alignment, straight leg raise testing was negative and motor and sensory were intact from L2 to S1.  Id.  X-rays of Plaintiff's spine showed spondylosis at L5-S1, but no significant changes in the disc spaces and x-rays of his left knee showed bicompartmental arthritis.  (Tr. 128, 276).  An MRI performed on October 27, 2004 showed bulging discs at L3-4 and L4-5 with facet changes and mild central narrowing and disc desiccation at L5-S1 and an annular tear with impression on the ventral thecal sac without evidence of significant central stenosis.  (Tr. 278-279).

On November 17, 2004, Plaintiff was evaluated by Ms. Kerry Clark, a registered nurse practitioner, for pain in his low back and left leg.  (Tr. 280-281).  Plaintiff walked with some antalgia, largely due to his left knee, but could stand on his heels and toes without difficulty.  (Tr. 281).  Muscle strength was 5/5 in Plaintiff's lower extremities.  The reflexes in his legs were 2+ and

equal; and seated and supine straight leg raises were negative for any back pain.  Id.  Ms. Clark referred Plaintiff to physical therapy which he attended for a brief period.  (Tr. 281, 354-366).

Dr. Marven Leftick of Rheumatology Associates first examined Plaintiff on December 13, 2004.  (Tr. 300-302).  Plaintiff complained of chronic problems with his left knee, spinal pain involving his neck and low back and right shoulder tenderness on abduction and rotation.  (Tr. 300).  Plaintiff exhibited excellent manual hand dexterity, and his wrists, elbows and left shoulder were unremarkable, but his right shoulder was tender at 110° of abduction and was irritable on end movement, especially internal rotation.  (Tr. 301).  Plaintiff's lower back was tender on flexion and lateral movement to the left.  Straight leg raise was negative on the right and positive at 60° on the left.  Id.  The right knee was normal, but there was tenderness on end movement of the left knee.  Plaintiff wore an external knee brace on his left knee and his gait was normal.  Id.  Dr. Leftick suspected that Plaintiff had impingement tendonitis in his right shoulder.  (Tr. 302).  An MRI of Plaintiff's right shoulder indicated rotator cuff tendonitis without evidence of a tear, mild AC joint arthrosis, mild subacromial/subdeltoid bursitis and a possible superior labrum anterior posterior ("SLAP") tear, but no discrete tear in the anterior or posterior labrum.  (Tr. 267-268).

On September 30, 2005, two years after Plaintiff last met the disability insured status requirement of the Act, Dr. Steven McCloy examined Plaintiff at his lawyer's request and reviewed his various medical records, a number of which were from after Plaintiff's disability insured status had expired.  (Tr. 347-353).  Dr. McCloy opined that Plaintiff had right shoulder tendonitis with a labral tear that met Listing 1.02B, left knee internal derangement with a failed ACL reconstruction and tri-compartmental osteoarthritis that met Listing 1.02A; and a degenerative disc of the lumbar spine with radiculopathy that met Listing 1.04.  (Tr. 352).  Dr. McCloy also opined that Plaintiff

could not walk for more than a block, needed frequent changes of position, could not sit for more than fifteen minutes at a time, could not safely operate controls with his left leg and had limited strength and limited range of motion in his right arm because of a shoulder labral tear and fracture. (Tr. 353).

The ALJ decided this case adverse to Plaintiff at Step Five. Although the ALJ found that Plaintiff suffered from several "severe" impairments (left knee osteoarthritis, right shoulder tendonitis, back disorder and depression), he determined that Plaintiff retained the RFC to perform a "significant range of sedentary work." (Tr. 22-23, Findings 3, 6 and 11). Based on this RFC, the ALJ determined that Plaintiff was not "under a disability" as his RFC would allow him to perform jobs which exist in "significant numbers" in the national and regional economy. (Tr. 23, Finding 12).

### A.     The ALJ Did Not Fail to Property Evaluate Plaintiff's Obesity

Plaintiff contends that he is obese and that the ALJ erred by failing to property evaluate his obesity under Social Security Ruling ("SSR") 02-01p. At the ALJ hearing, Plaintiff testified that he was 6' 1½" tall and weighed 255 pounds. (Tr. 31). Plaintiff's counsel made an opening statement and did not use the word obesity or make any reference to Plaintiff's weight in outlining her client's disability claim. (Tr. 28-30). Plaintiff also did not mention obesity during his testimony when he explained to the ALJ why he was unable to work. (Tr. 35). Further, Plaintiff's application for benefits did not identify obesity as a disabling condition. (Tr. 96).

Effective October 25, 1999, listing 9.09 (obesity) was deleted from the listing of impairments contained in 20 C.F.R. Part 404. See SSR 02-01p (citing 64 F.R. 461222 (1999)). In order to meet the previous obesity listing, an individual of Plaintiff's height would have to weigh at least 346

pounds, or nearly 100 pounds more than his reported weight at the time of the ALJ hearing. Although the obesity listing has been eliminated, paragraphs entitled "effects of obesity" were added to other listings, e.g., Listing 1.00Q (disorders of the musculoskeletal system), Listing 3.00I (disorders of the respiratory system), and Listing 4.00F (disorders of the cardiovascular system). For instance, the musculoskeletal listing indicates that "adjudicators must consider any additional and cumulative effects of obesity" when assessing a claimant's RFC.

In this case, the ALJ cannot be faulted for not specifically addressing Plaintiff's obesity. As noted above, neither Plaintiff nor his attorney argued to the ALJ that Plaintiff was obese and that such obesity limited his ability to work. In his brief, Plaintiff criticizes the ALJ arguing that "[h]e simply ignored the diagnosis [of obesity] completely." Document No. 7 at p. 8. Plaintiff does not, however, provide any citation to the record to point to a diagnosis of obesity in either his initial or reply brief. This Court has reviewed the record and did not find such a diagnosis. In fact, although Plaintiff's weight is routinely noted on his medical records, there does not appear to be any discussion of his weight or any record of Plaintiff being given any medical treatment related to his weight, or placed on a diet and/or exercise program. Even Plaintiff's chosen expert, Dr. McCloy, makes absolutely no mention of obesity in his report or the impact of Plaintiff's weight on his back or knee problems. (Tr. 347-353). Further, in his March 2004 RFC assessment, Dr. Tonelli, a DDS consultant, noted Plaintiff's height (seventy-four inches – one-half inch taller than Plaintiff testified) and weight (252 pounds – three pounds lighter than Plaintiff testified) in opining that Plaintiff could perform sedentary work. (Tr. 229). The ALJ expressly adopted this opinion in making his RFC assessment. (Tr. 19).

SSR 02-01p indicates that the National Institutes of Health ("NIH") utilizes a body mass index ("BMI") in determining obesity. The NIH recognizes three levels of obesity. Applying the BMI to Plaintiff's height and weight at the time of the ALJ hearing, it indicates that Plaintiff has Level I, or the least severe level, of obesity. However, SSR 02-01p notes that the BMI is not always an accurate indicator of obesity and that someone with a BMI indicating Level I obesity may not be obese if a large percentage of the weight is from muscle. The record is silent on this issue.

Even if you assume Plaintiff suffers from obesity, the record simply does not show that such condition resulted in significant functional limitations beyond those reported and related to his knee, back and shoulder impairments. Plaintiff testified that he could sit for ten to fifteen minutes at a time, could stand for the same length of time and could carry thirty pounds in his left arm, but that carrying this weight in his right arm would result in shoulder pain after a few minutes. (Tr. 39, 41, 42). Plaintiff was able to perform these tasks, and his obesity did not prevent him from doing so. These tasks are compatible with the functional capacity for performance of work that allows Plaintiff to change positions from sitting to standing "at will" and requires only occasional lifting or carrying up to ten pounds. Plaintiff has not shown that his weighing 255 pounds prevented him from performing the reduced range of sedentary work with a sit/stand option consistent with the ALJ's RFC finding. Further, the VE testified as to the existence of a significant number of such jobs in the regional economy. (Tr. 51). The ALJ did not err by failing to specifically address Plaintiff's obesity and, even if such failure was error, it is harmless in this particular case because Plaintiff has pointed to nothing in the record to indicate that his weight would preclude him from performing the limited range of sedentary work provided in the ALJ's RFC assessment.

### B.    The ALJ Properly Weighed and Evaluated the Medical Evidence in Making His RFC Assessment.

In his decision, the ALJ provides a detailed explanation of the respective weights accorded to the various medical opinions offered regarding Plaintiff. (Tr. 19-20). Although Plaintiff disagrees with the ALJ's ultimate conclusions, he has not shown any error in the ALJ's evaluation of medical evidence. See Rivera-Torres v. Sec'y of Health and Human Servs., 837 F.2d 4, 5 (1st Cir. 1988) (the resolution of evidentiary conflicts is within the province of the ALJ).

Plaintiff alleges that in determining his RFC, the ALJ failed to give appropriate weight to the opinion of Dr. Limbird, whom he characterized as his treating orthopedist. A treating physician is generally able to provide a detailed longitudinal picture of a patient's medical impairments and an opinion from such a source is entitled to considerable weight if it is well supported by clinical findings and not inconsistent with other substantial evidence in the record. See 20 C.F.R. § 404.1527(d). The amount of weight to which such an opinion is entitled depends in part on the length of the treating relationship and the frequency of the examinations. See 20 C.F.R. § 404.1527(d)(l).

The record indicates that in a period of almost three years, Dr. Limbird examined Plaintiff only twice, in January 2002 (Tr. 129-130) and in October 2004. (Tr. 128). Following the October 2004 examination, Dr. Limbird completed a pain questionnaire in which he indicated that osteoarthritis of Plaintiff's left knee could be expected to produce pain and opined that the pain was of such severity that it could result in a moderately severe reduction in attention, concentration and productivity in a competitive work setting. (Tr. 263). The ALJ considered this opinion, but found that the degree of treatment and medication given Plaintiff for his physical and mental impairments did not support more than a moderate limitation in these functions. (Tr. 20). The ALJ's RFC

finding included "a moderate limitation in the ability to maintain concentration/attention for extended periods due to both pain and depression." (Tr. 23 at Finding 6).

It should be noted that Dr. Limbird's opinion as to the degree of pain resulting from Plaintiff's osteoarthritis of his left knee was offered in October 2004, and the issue in this case is whether Plaintiff was disabled as of September 30, 2003. In September 1999, Plaintiff fell from a ladder and reinjured his left knee. On examination, the range of motion in his knee was full, though painful. (Tr. 275). In December 2001, there was no general ligament laxity in Plaintiff's left knee, range of motion was symmetrical and Plaintiff was released to "moderate duty as tolerated." (Tr. 310-311). When Dr. Limbird examined him in January 2002, he observed that Plaintiff was in no acute distress and walked with a normal gait. (Tr. 129). Dr. Limbird noted that, despite a deficiency of the ACL, the absence of meniscal tissue, Plaintiff did not demonstrate any significant instability of his left knee. (Tr. 130). When Dr. Morrissey examined Plaintiff in January 2004, x-rays of Plaintiff's left knee showed "early" degenerative changes and spurring across the knee and some "mild" joint narrowing across the medial side of the knee. (Tr. 210). These findings do not support the proposition that Plaintiff's knee condition resulted in a degree of pain that would have resulted in moderately severe reduction in attention, concentration and productivity in a competitive work setting as of September 30, 2003, when Plaintiff last met the disability insured status requirement of the Act.[2] The ALJ's assessment is supported by substantial evidence and is entitled to deference.

---

[2] In his Reply Memorandum, Plaintiff argues that the fact that he is a candidate for a future knee replacement "verifies" the severity of his pain. Document No. 9 at p. 4. Plaintiff cites no medical or legal support for this proposition. Although Dr. Limbird reported that Plaintiff "may have to consider a total knee replacement in the future," (Tr. 128), and Dr. Morrissey concurred, (Tr. 210), those findings came months after Plaintiff's last insured date and, in any event, do not call into question the ALJ's assessment of a "reduced" sedentary work RFC. (Tr. 22, Finding 6).

Plaintiff also argues that the ALJ failed to take into account evidence from Dr. McCloy's September 30, 2005 examination of him.  The ALJ acted appropriately in giving those clinical findings limited weight in this case because they represented Plaintiff's condition some two years after his disability insured status expired and not at the time it expired on September 30, 2003.  The ALJ also properly noted the existence of an "element of bias" in the report since it was arranged by Plaintiff's counsel on the eve of the ALJ hearing.

Plaintiff contends that the ALJ "simply ignores Dr. McCloy's opinion and instead focuses on the fact that the examination was arranged by [Plaintiff's] counsel."  Document No. 7 at pp. 8-9.  This contention is not supported.  First, the ALJ accurately noted the contradiction between Dr. McCloy's conclusion, based on a single examination and medical records review, that three of Plaintiff's conditions were of "listing-level severity," and the fact that no treating physician found any listing-level impairments.  (Tr. 19).  The ALJ properly exercised his discretion in giving "diminished weight" to Dr. McCloy's opinion.  The ALJ supported his finding by noting that Dr. McCloy's "opinion regarding [Plaintiff] meeting the requirements of three separate 'listings' is rejected outright, in light of his plain misinterpretation of Social Security Regulations and in light of the conflict between his conclusions which, with regard to Plaintiff's back impairment, are at odds with objective findings, including full range of motion and negative neurological examination." (Tr. 20); see also (Tr. 19, 300-305).  The ALJ did not ignore Dr. McCloy's opinion and had substantial, supported reasons other than "an element of bias" for giving diminished weight to it.

Plaintiff contends that Dr. Morrissey's report from his examination of Plaintiff in January 2004 is not consistent with the ALJ's RFC finding for sedentary work with a sit/stand option.  Plaintiff correctly notes that SSR 96-9p indicates that performance of the full range of sedentary

work requires standing and/or walking for about two hours during an eight-hour workday.  Plaintiff asserts that Dr. Morrissey's report does not support a conclusion that he can stand and walk enough to perform sedentary work.

The ALJ, however, did not find that Plaintiff could perform the full range of sedentary work but rather a reduced range that allowed for an "at will" sit/stand option. When Dr. Morrissey examined him in January 2004, Plaintiff's only complaint involved left knee problems.  (Tr. 209). There was some crepitus of the patellofemoral joint and the medial compartment of Plaintiff's left knee; quadriceps strength was 4+ on the left and 5+ on the right; and the use of a cane in Plaintiff's right hand significantly improved his otherwise antalgic gait pattern.  Id.  X-rays of Plaintiff's left knee showed "early" degenerative changes and spurring across the knee and some "mild" joint narrowing across the medial side of the knee.  (Tr. 210).  Dr. Morrissey opined that a cane and brace were medically necessary for anything but the shortest of walks, that Plaintiff could not squat or kneel, and that walking down stairs or for any distance was difficult.  Id.  Dr. Morrissey's examination report supports the ALJ's finding that Plaintiff could perform a reduced range of sedentary work that allowed him to alternate sitting and standing at will.

Plaintiff's allegation that the ALJ's RFC finding failed to "quantify" how often he would need to be allowed to alternate between sitting and standing is without merit.  (Document No. 7 at p. 12).  The ALJ specifically noted that the range of sedentary work that could be performed was "reduced by a requirement that he be able to sit or stand at will." (Tr. 20, 22 at Finding 6) (emphasis added).  Thus, the ALJ's RFC finding allowed Plaintiff to limit standing as much as he needed, which is clearly consistent with Dr. Morrissey's findings, Plaintiff's testimony that he could sit or stand for up to fifteen minutes at a time, (Tr. 41-42), and the VE's testimony that a person could

-23-

adequately perform the sedentary jobs he identified even if he alternated between sitting and standing every "15 to 25 minutes" and that it could only become a "problem" when the frequency was every "five or ten minutes."  (Tr. 53).

Thus, the record as a whole, and in particular Dr. Morrissey's examination of Plaintiff shortly after his disability insured status had expired, supports the ALJ's finding that as of September 30, 2003, Plaintiff had the RFC to perform sedentary work with a sit/stand option that did not require work above shoulder level with the right arm and that could be performed with a moderate limitation in maintaining concentration or attention for extended periods.

In making his RFC assessment, the ALJ properly considered the medical source opinions, Plaintiff's testimony and credibility and Plaintiff's record of daily activities.  The ALJ's assessment is supported by substantial evidence and entitled to deference.  See Benetti v. Barnhart, No. 05-2890, 2006 U.S. App. Lexis 22685 (1st Cir. Sept. 6, 2006) (per curiam) ("The ALJ's resolution of evidentiary conflicts must be upheld if supported by substantial evidence, even if contrary results might have been tenable also.").

### C.    The ALJ Properly Evaluated Plaintiff's Credibility

In his decision, the ALJ found Plaintiff's testimony credible as it related to his "inability to stand/walk for extended periods without pain." (Tr. 19).  However, he rejected Plaintiff's allegation of "total disability" as not supported by and inconsistent with the medical and other evidence of record.  Id.  In attacking this credibility determination, Plaintiff's counsel contends that his "service to America should bolster his credibility, as he spent several years of his life working as an infantry

soldier in the United States Army where he sustained the very injuries[3] that have come back to roost." Document No. 7 at p. 16. Plaintiff's argument is unsupported and inappropriate.

While Plaintiff's military service is highly commendable, his counsel provides absolutely no legal support for the argument that a veteran's testimony is entitled to a presumption of credibility. In this case, the ALJ found much of Plaintiff's testimony credible and assessed a sedentary RFC. The ALJ only rejected Plaintiff's assertion of total disability which is plainly not supported by the record as a whole. It is unfortunate that Plaintiff injured his knee (first while running and later playing basketball) during his military service. However, that fact does not of itself entitle him to Social Security Disability Benefits or any presumptions in his favor. Plaintiff testified that he has been receiving monthly VA service-connected disability benefits for the last eight years, and there is no question that he should receive all Government benefits to which he is legally entitled. However, the ALJ determined that Plaintiff was not legally entitled to Social Security Disability Benefits, and this Court has found no error in that decision.

## VI.   CONCLUSION

For the reasons stated above, I recommend that the Commissioner's Motion for an Order Affirming the Decision of the Commissioner (Document No. 8) be GRANTED and that the Plaintiff's Motion to Reverse Decision of the Commissioner (Document No. 7) be DENIED. I further recommend that the District Court enter Final Judgment in favor of Defendant.


  /s/ Lincoln D. Almond
LINCOLN D. ALMOND
United States Magistrate Judge

---

[3] The only injury suffered by Plaintiff during his military service was a knee injury. There is no indication in the record that Plaintiff's back or shoulder problems were the result of injuries suffered during military service.

December 4, 2006